IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

EDGEWATER HOUSE
CONDOMINIUM ASSOC., INC.,

       Case No. _____

       Plaintiff,

vs.

CITY OF FORT LAUDERDALE,
FLORIDA, a Florida Municipality,
by and through its City Commission,

       Defendant.

_____/

## COMPLAINT

Plaintiff, EDGEWATER HOUSE CONDOMINIUM ASSOCIATION, INC.

("Edgewater"), a Florida Not-For-Profit Corporation , sues Defendant, THE CITY OF FORT

LAUDERDALE, a Florida Municipality (the "City"), and asserts:

## JURISDICTION AND VENUE

1.  This is a civil action against the City in which Edgewater asserts equal protection and

procedural due process claims in violation of the Fifth and Fourteenth Amendments of the

United States Constitution under 42 U.S.C. § 1983.

2.  This court has federal question jurisdiction over this action under 28 U.S.C. § 1331 and

42 U.S.C. Sections 1983 and 1988.

3.  The Edgewater Condominium site is located in Broward County.

4.  City of Fort Lauderdale, Florida is located in Broward County.

5.  Venue lies in this Court pursuant to 28 U.S.C.A. section 1391(b).

48742501;2

## PARTIES

6.   Plaintiff Edgewater is a Florida Non-Profit Corporation that was formed to maintain the Edgewater Condominium site (the "Property"), the real property at issue in this case. The Property currently consists of 30 individual condominium units with independent owners.

7.   Defendant City is a political subdivision (municipality) of the State of Florida, having its administrative offices at 100 North Andrews Avenue, Fort Lauderdale, Florida.

## FACTUAL BACKGROUND

8.   As required by the State's Growth Management Act, chapter 163, Florida Statutes, the City adopted Unified Land Development Regulations ("**ULDR**") that govern and regulate land use and development decisions within its jurisdiction, including the Property here.

9.   In addition, the City drafted a Downtown Master Plan ("**DMP**"), which applies to the area where the Property is located here. But the DMP is not codified and functions solely as a guideline to express a general desire and intent.

10. In accordance with these documents, in February 2017, Edgewater submitted to the City an application seeking approval to build the Alexan Tarpon River, a residential development, in the Downtown City Center District. The application was reviewed by the City of Fort Lauderdale's Design Review Team (the "DRT") and its Development Review Committee ("DRC"). Both the DRT and the DRC found the Alexan largely met the DMP Guidelines and fully complied with the UDLR, but the staff requested a few adjustments and additional information on certain design aspects.

11. For example, the DRT requested that the building's parking levels be camouflaged with "creative screening" and that green elements be added to the rooftop to create "visual interest" and a "compelling street presence." The developer agreed to make these cosmetic adjustments.

2

The DRC also provided extensive comments based on each individual DMP Guideline. The developer addressed each comment in turn and agreed to make any and all necessary adjustments to address the DRC's concerns.

12. Because the Alexan's location is proximate to certain historic landmarks (the Stranahan House and Smoker Park), Edgewater also submitted an application to the Fort Lauderdale Historic Preservation Board. The Preservation Board determined the Alexan would not adversely affect any historic landmark. In fact, it found it would positively enhance Smoker Park, favorably noting that the first two floors of the Alexan nearest the Park are raised, "creating open space that leads directly into the park … which creates interaction between the structure and the park."

13. The developer also contacted the City of Fort Lauderdale's Public Works Department regarding water and sewer demand. The Department determined the 6-inch water main would need to be increased to 8 inches, which the developer agreed to do. Available public services were adequate in all other respects.

14. In addition, the Florida Department of Transportation approved the Alexan's proposed driveways for ingress and egress. Florida Power and Light also confirmed it had sufficient capacity to service the Alexan.

15. Although a traffic study was not required, "in order to be a good neighbor" the developer also commissioned a traffic analysis to address neighboring communities' concerns. The analysis concluded the Alexan would not have any significant impact on traffic because it would generate less than 1,000 daily trips and "approximately 3 additional vehicles per hour during the peak hour" in the 15 or so surrounding streets.

3

16. In addition, while not required by any code provision or contained within any uncodified guidelines, the developer agreed to set the building back 135 feet from the riverfront, creating 3,800 feet of dedicated public park space.

17. Following more than a dozen meetings, and numerous site plan modifications, on March 6, 2018, the DRC issued a formal letter approving Edgewater's application to develop the Alexan. The DRC found all comments had been addressed, and the Alexan, as proposed, fully satisfied all ULDR requirements and the DMP's intent.

18. Importantly, the DRC found that the Alexan was well below the maximum allowable height and, as proposed, was significantly farther away from the river's edge than the guidelines require, creating additional public space and positively "contribut[ing] to the public realm."

19. In addition, the DRC believed the Alexan was a welcome addition to Downtown City Center, commenting positively on, among other things, the "open and welcoming gateway to Riverwalk", the "exceptional public realm space", the "large, covered plaza", the building's orientation facing "both the street and the park, in stark contrast to the existing building … which turns its back to it", the "slender tower [allowing] sufficient light and air", the abundance of glass "providing a touch of skyline drama", the parking garage screened "to convincingly appear as habitable space", and the landscaped roof and pool amenities.

20. Under the ULDR, the DRC's preliminary approval automatically became final in 30 days, on April 5, 2018, unless, before the 30-day expiration, the City Commission voted to review the application.

21. Importantly, the City Commission could not arbitrarily call up any approved project for review. Under ULDR Section 47-13.20.N.2, the Commission may only review an application if

4

it first finds that the DRC "misapplied or failed to apply one (1) or more requirements of the ULDR or the city's Comprehensive Plan in approving the application."

### *The April 3, 2018 Hearing*

22. The City Commission first considered Edgewater's application at a public meeting on April 3, 2018. Mayor Trantalis recommended the Commission set a de novo hearing "to hear the testimony regarding the—the compliance of [the Alexan] to the ULDR at a later meeting."

23. Commissioner Moraitis questioned whether a de novo hearing was necessary if the Commission determined the developer had met the development standards, "done their due diligence, the standards that we pass in our own New River Master Plan."

24. The City Attorney confirmed that, to justify calling up the Alexan at a future de novo hearing, the Commission would have to first conclude that the DRC either misapplied or failed to apply one or more of the ULDR's requirements.

25. The City Attorney acknowledged that, in the past, a de novo hearing had been granted when the Commission merely "had a concern that potentially the criteria have not been met." However, the City Attorney explained that past procedure did not comply with ULDR section 47-13.20, which requires the Commission to "make some sort of determination that something has not been followed with regards to the ULDR" before setting a future de novo hearing.

26. Commissioner Glassman asked whether he could amend his motion to express his specific concerns with the ULDR. With the Mayor's permission, Commissioner Glassman stated he had "several" concerns. Without describing any specific way the DRC misapplied or failed to apply the ULDR, Commissioner Glassman stated "the ULDR talks about integrity and character

5

of adjacent neighborhoods. It talks about the neighborhood master plan. There are elements of the downtown master plan. There are ULDR issues, comprehensive plan issues I mean, do you want me to list all of them or just what I have concerns?"

27. Mayor Trantalis, in an apparent attempt to pinpoint some particular way Commissioner Glassman believed that the DRC had misapplied or failed to apply the ULDR, asked: "Do you feel that, perhaps the transitional zoning is applicable here?" Commissioner Glassman did not agree that he believed the DRC misapplied or failed to apply the transitional zoning requirements. He instead replied, "I would like to flush that out in a hearing, yes. I mean, I just don't think that I've heard enough that, you know, I'm willing to say—."

28. Despite the plain and unequivocal mandates in the City's own code that the Commission first make a specific finding that the DRC misapplied or failed to apply the ULDR, the City Attorney advised that, based on "past practices," Commissioner Glassman's generalized concerns were "enough of a justification … to proceed forward" with voting on whether to conduct a de novo hearing.

29. Counsel for Edgewater objected to the process because the Commission had not stated how the DRC had allegedly misapplied or failed to apply the ULDR. The Mayor nonetheless opened the floor for comments on whether to schedule a de novo hearing.

30. The ensuing comments did not show (or even focus on) how the DRC may have misapplied or failed to apply the UDLR. Comments instead consisted mainly of neighborhood concern over the building's proposed height. No one pointed to any guideline or regulation the DRC misapplied or failed to apply.

31. After the public hearing closed, Commissioner Moraitis asked whether the proposed building exceeded the height requirements for the DMP. Anthony Faber, the Director of

6

Sustainable Development for the DRC, answered that it did not. While the plan encourages transition heights in some areas, that does not apply to the Alexan's location. He also explained that the transition zone heights were intended to protect residential neighborhoods adjacent to the development, but, due to "the wide right-of-way from federal highway and the tunnel", the transition heights do not apply to the property here.

32. Given the confusion and the lack of any actual testimony and evidence supporting that the DRC had misapplied or failed to apply one or more of the requirements of the ULDR or Comprehensive Plan, Commissioner McKinzie lamented:  "This whole process is a lack of due process." The Commission nevertheless, and without making any finding as to how the DRC misapplied or failed to apply the ULDR or Comprehensive Plan, voted 4 to 1 to call up the Alexan and conduct a de novo hearing on May 15, 2018.

### The May 15, 2018 Hearing

33. In preparation for the May 15 hearing, the City Manager wrote the Commission recommending that it "adopt a resolution approving the issuance of a Site Plan Level II Development Permit for 'Alexan-Tarpon River.'" The City Manager included detailed information explaining why the proposed Alexan development fully complies with the ULDR regulations and the DMP Guidelines. Specifically, the memorandum stated:

    a.  1,088 residential units were available in the Downtown City Center, so if 151 residential units were allocated to the Alexan, 937 units will remain;

    b.  The maximum building height is 499 feet, and the proposed Alexan development is only 216 feet, 8 inches;

    c.  The minimum setback from the river is 45 feet, and the proposed Alexan development is set back 135 feet;

    d.   Surrounding building heights range from 9 to 45 stories, and the Alexan development would have just 21 stories.

34. In addition, the City Manager noted both the DRC and the Historic Preservation Board had already approved the Alexan. The Preservation Board especially appreciated "the 20 foot raising of the north wing, which allows for a covered open space that flows seamlessly into the park … floor to ceiling windows open onto the park space, allowing interaction between the structure and the park." The City Manager further noted that capacity studies for public service availability had been conducted and addressed, as was a traffic impact study, which was not required but was completed to address concerns of the Rio Vista neighborhood, and, in general, in the interest of being a good neighbor.

35. The City Manager also explained the Alexan is consistent with the DMP's guidelines and intent because it includes, among other desirable features:

    a.   a spacious and welcoming gateway to Riverwalk;

    b.   generously-wide paved areas inviting pedestrians, and tree-canopied lawn areas, effectively expanding Smoker Park, which was currently a paved asphalt parking lot;

    c.   <u>3800 square feet of private land dedicated to public open space</u>;

    d.   an unenclosed entrance plaza providing a proper edge to Smoker Park;

    e.   exceptional public space at the river's edge including a building height of only 6 stories, where the preferred maximum is 9 stories;

    f.   historic markers provided by the developer;

    g.   a pleasingly slender tower allowing light and air to reach the ground;

    h.   a glass upper wing providing "a touch of skyline drama, and representing a high level of architecture."

8

36. When the meeting opened, counsel for Edgewater renewed her objection to the de novo review process. She noted the Alexan is code-compliant, as the DRC previously found. She also noted that, in addition to complying with ULDR requirements and the DMP's intent, the developers had gone above and beyond by agreeing to dedicate 135 feet of private land to create a large public park between the Alexan and the seawall. Finally, as an alternative, counsel stated that Edgewater would agree to a building modification—reducing the tower's 21 stories to just 14—if that would alleviate neighborhood height concerns and guarantee site plan approval.

37. Cecelia Ward, President of J.C. Consulting, who had been retained on behalf of Edgewater to render an expert analysis on the Alexan, explained to the Commission that the Comprehensive Plan is the foundation for all development within the City. From that document, the City adopted the ULDR (Chapter 47), which provides the tools for implementing new development. The Regional Activity Center City Center ("Activity Center"), the zoning district where the proposed Alexan would be located, is the "most intense and dense future land use category permitted within the city." The Activity Center requirements set specific goals, objectives, and policies with which new developments must strive to comply. Ms. Ward reviewed each goal, objective, and policy and established that the Alexan, both as originally proposed and as alternatively proposed with just 14 stories, is fully compliant.

38. Commissioner Sorensen asked Ms. Ward to talk about the transitional zones within the Activity Center. Ms. Ward explained—as DRC staff had previously explained at the April 3 meeting—that the Property is not contiguous to any residential property, so the transition zones do not apply. Also, to trigger the neighborhood compatibility requirements, the development must either (1) be within 100 feet of property outside of the Activity Center, which the proposed

48742501;2

Alexan is not; or, (2) deviate from the New River design standards, which it does not. Transition zone restrictions do not apply.

39. Ms. Ward further noted the DMP was intended to stimulate downtown residential development. She found in her expert analysis, the Alexan complies with all of its provisions and the Comprehensive Plan. Finally, in her report, Ms. Ward set out each goal and policy under the Activity Center guidelines, the Comprehensive Plan, the ULDR and DMP provisions, intents, and purposes, the list of permitted and conditional uses, the review process and the special regulations, and in a checklist format, showed that the Alexan, as originally proposed or as modified, complies with each and every design provision. In conclusion, Ms. Ward stated:

> [I]t complies with the comprehensive plan and the ULDR's. Nothing's been changed that would warrant it to be noncompliant. The site plan does not materially alter the use, the density or intensity of the subject property in any manner that is inconsistent with the City's adopted comprehensive plan. And lastly, that the request is consistent with the City's adopted comprehensive plan in compliance with the unified development regulations and thus, in my professional opinion, the city should issue the development permit for the site plan both as originally submitted and if desired, I believe that same statement could be made with respect to the modified design. Thank you.

40. Commissioner Glassman asked the City Attorney if he agreed with Ms. Ward that the neighborhood transitional height restrictions are inapplicable, and he confirmed that the transition zones do not apply to the Alexan's location in the Activity Center.

41. Other Commissioners then raised various topics such as the number of residential units in the modified development plan, the dedicated public park, traffic, whether some DMP guidelines carry more weight than others, and how the project guidelines would differ if the Alexan was a commercial development—notably none of which is relevant to (1) whether the DRC misapplied

or failed to apply the ULDR in approving the application, or (2) whether the project in fact complies with the ULDR requirements and the DMP guidelines.

42. Commissioner McKinzie expressed his frustration with due process given that the project clearly meets the applicable criteria and should be automatically approved.

43. Commissioner Glassman then conceded that his misgivings in approving the Alexan stemmed from his receiving political pushback from his constituents. He revealed he had been receiving "a ton of emails … from people in opposition" to the project stating "don't forget why we voted for you, we voted for you … to slow down development, this project violates the master plan, this project is a strain on the infrastructure, this project is a strain on the traffic, we don't like the ingress and the egress, the master plan guidelines are not being met, too much development downtown."

44. After communications began to break down, and it became clear the Commission was unprepared to make a decision, it voted to continue the hearing until the next Commission meeting on June 19, 2018.

***The June 19, 2018 Hearing***

45. In preparation for the June 19, 2018 hearing, counsel for the developer submitted two document binders containing the following relevant information supporting the proposed Alexan's compliance with the URDL and the DMP guidelines:

 a. the City Commission agenda with the site plans and previous approvals from various boards attached;

 b. The Staff Report and Vote Summary from the May 15, 2018 meeting;

 c. The transcript from the May 15, 2018 meeting;

 d. The alternate site plan with the DRT checklist;

11

e.   An updated sign affidavit of the June 19 meeting;

f.   An updated wastewater capacity letter stating the capacity is sufficient;

g.   An email from Kevin Markow stating the Concerned Citizens for the Preservation of our Neighborhood and the Watergarden Board do not oppose the proposed amended site plan, nor does Las Olas Grand;

h.   A letter from Jeffrey Shir with Becker and Poiliakoff to Courtney Crush stating it agrees with the modified plan as discussed;

i.   A traffic calming improvement plan which was not required by FDOT or by the ULDR, but which was commissioned solely to address any Commissioner's traffic concerns;

j.   A memorandum detailing the developer's continuing objection to the de novo hearing because the Commission did not specify what provision of the ULDR the DRC either misapplied or failed to apply in approving the Alexan site plan; and

k.   An Expert Opinion prepared by Cecelia Ward, President of J.C. Consulting Enterprises Inc., describing in express detail with attached documentation, how the Alexan, as proposed, is consistent with the (1) comprehensive plan including the city future land use element; (2) Unified Land Development Regulations; (3) intent of the Downtown Master Plan; and (4) chapter 163, Florida Statutes.

46. Anthony Fajardo, the Director of Fort Lauderdale's Department of Sustainable Development, made the first presentation supporting approval. Mr. Fajardo previously worked as the Zoning Administrator for Fort Lauderdale and was also a City Planner at levels I, II, and III. He explained that the DRC staff all have Bachelor degrees, some have Master's degrees, and most have advanced certifications and have been practicing for many, many years.

12

47. Mr. Fajardo stated he and his staff worked with the applicant for over a year and the project had been unanimously approved by "the Department of Sustainable Development, Transportation and Mobility, Parks and Recreation, Public Works, police and fire, among others." Mr. Fajardo explained that the DMP is a "qualitative intent-driven document [that] uses established design guidelines [while] maintaining flexibility to allow for creative design solutions." The guidelines provide a roadmap to achieve the DMP's intent. And the Alexan, as originally proposed, meets those guidelines in all areas including street design, building design, and architecture. While a modified 14-story structure would also meet the guideline's intent, DRC staff determined that "the original proposal met that intent better than the modified plan."

48. Commissioner McKenzie bluntly asked whether Mr. Fajardo and his staff had misapplied or failed to apply any ULDR provisions in approving the development, and Mr. Fajardo replied they had not. Commissioner McKenzie then further stated that, to deny Edgewater's site plan application, the Commission must make a finding that it does not meet a ULDR requirement. He clarified if an applicant meets the ULDR requirements, the plan must be automatically approved.

49. The City Attorney also explained (again) that the DRC had already approved the Alexan under the code for Site Plan Level II development, so, for the project to be subsequently denied, the Commission would "have to find that there was a misapplication or an error."

50. The Mayor then posed various scenarios asking whether the Commission could find that the staff improperly afforded more weight to some criteria and not others. The City Attorney explained that would be impossible given the DMP's flexibility. For the Commission to hold the DRC's approval was erroneous, it must find misapplication—it would have to find that the DRC completely ignored a plan provision, not that it considered it along with all other provisions and still approved the project, as it properly did here.

13

51. The Mayor then asked whether the applicant or staff had considered reducing the number of residential units within the proposed development. The Director acknowledged it may be possible to reduce density, but he reminded the Mayor that the applicant had agreed to dedicate a significant plot of public space between the building and the river's edge, balancing "what they can do and what [is] feasible."

52. The Mayor commented that the 14-story modified version did not seem to be any compromise given it had the same number of units as the original proposal, and thus the same impact on traffic. The Director reminded the mayor that the purpose of the modified version was to address height concerns, not traffic. Moreover, the original building plan was too small to even require a traffic study under the ULDR—although the Applicant did, in fact, commission a traffic study, which found that the 180-unit building would have no negative impact on traffic.

53. The Mayor then argued that "a lot of talk has occurred lately … people are feeling we're overbuilding. … so I'm just wondering why Staff continuing [sic] to be on this path of build, build, build, when the people are saying stop, stop, stop, stop." Commissioner Glassman again chimed in regarding the transition zones and wondered why that would not affect the project density. And the Director again explained that—under the City's own rules—the transition zones do not apply to Site Plan Level II developments such as the Alexan.

54. The Mayor then opened the meeting for public comment. Importantly, no expert witness spoke in favor of not approving the application, and no witness, expert or otherwise, showed how the DRC misapplied or failed to apply the ULDR in approving the Alexan development. Instead, citizens raised, for example, their personal opinions regarding traffic concerns (despite the expert analysis that had shown no adverse impact would occur); fire safety issues (despite that the fire department had approved the project); and height and density concerns (despite that the Alexan,

at 216 feet, 8 inches, is well under the 499 foot maximum and at 180 units is well within the 1088 units available).

55. Commissioner McKenzie aptly noted that, if the City Commission does not want development, then it needs to change its code. He lamented that the project meets all the applicable regulations and guidelines but yet "[w]e're trying to tear it down."

56. After public comment closed, counsel for Edgewater renewed her objection to the de novo hearing. She reiterated that staff had approved the project and reminded the Commission that the Activity Center is the urban core in which the DMP "intend[ed] for high density, high intensity unlimited height." The project was reviewed and approved for adequacy of public services, and developing the Alexan will actually improve those services.

57. Discussion then ensued as to whether to approve the original or the modified 14-story Alexan. The City Manager stated the DRC approves either version but prefers the original proposal.

58. Still determined to reduce the approved density, the Mayor claimed he made a promise to the neighborhoods not to permit overdevelopment, and he was "gonna keep that promise." Commissioner McKenzie pointed out that no density problem could exist because the project had been approved through the Commission's own process under its own guidelines.

59. The Mayor then called for a 10-minute break so he could speak privately with the developer—flatly ignoring the City Attorney's warning against the ex parte communication. Following the break, the mayor announced that the developer had agreed to reduce the density from 180 units to 120 provided (1) he can cancel the deal if the numbers don't "work out"; and (2) the unit reduction passes architectural review.

15

60. Collectively, the Commissioners expressed outrage at this unusual process and the Mayor's behavior. Commissioner Glassman: "I just vehemently oppose this process and this way of doing business"; Commissioner McKenzie: "I'm at a loss for words. … We have just micromanaged this thing to almost not being manageable."; Commissioner Glassman: "You're the one that called for a break and let's go negotiate behind closed doors and we'll talk to each other. No, that's not the way we do business. We do business in the sunshine. … That's the way we've always done business. This is a drastic change. … I have a right to speak my opinion about a process I think is screwed up."

61. Commissioner McKenzie further expressed his frustration, noting that the Commission itself had developed the rules and the criteria for new development, and, if the staff found that the developer met that criteria, the project should be deemed approved as originally proposed.

62. The Commission nonetheless passed a resolution to not approve the project, but it was unclear on what basis. In fact, after the Commission voted, the Mayor asked the City Attorney whether they needed to state a factual basis for the resolution, which they had not done. The City Attorney replied that "the record speaks for itself." He explained that for the resolution to be valid, it must be based on competent substantial evidence and the essential requirements of law. Competent substantial evidence must be evident from the record that was created at the two hearings (May 15 and June 19). But since the Commission had already voted, "[t]here is nothing that can be said now to add to the resolution that would somehow make it stronger."

63. At Edgewater's urging, the Commission agreed to again continue the hearing. The Commission rationalized that the resolution to approve a 120-unit 14-story structure had not been approved. Technically, it reasoned that differed from denying the permit, justifying a continuance until August 21, 2018.

*The August 21, 2018 Hearing*

64. At the August 21 hearing, Edgewater's Counsel explained that Edgewater and the developer considered and rejected the lower 120-unit density proposal because it was not economically feasible. Edgewater determined the initial proposal, which had been fully vetted and approved by staff, was best for the company, the community, the Riverwalk, and the Park.

65. The Mayor immediately advocated to deny the application because Edgewater did not present a modified project with reduced density, as he had anticipated. He was also annoyed that City Staff continued to recommend the original project—the 181-unit, 21-story structure that it previously vetted and approved—even though "there was no factual basis for [Staff] to change the recommendation."

66. Commissioner Glassman also favored denying the application, spouting a spate of generalities such as: "I do not believe that it conforms with the Downtown Master Plan and I do not believe that it conforms with the New River Master Plan. I have issues with adequacy and capacity. I have issues with the parking and circulation. I have issues with the master plan consistency. I have issues with traffic. I have issues with EMS coming around the corner. I have issues with the archeological survey. … I would object to Staff's conclusions with regard to all of that."

67. The City Attorney reminded the Commissioners that general concerns are insufficient to deny the application. Rather, denying an application requires a finding that the applicant did not meet the published criteria. He told the Commission its decision must be based on competent substantial evidence that it "received through this evidentiary process, as well as following the essential requirements of law which is essential to your code." In addition, he explained competent substantial evidence must have been received through the City Commission hearings,

17

and it must be based on "something that is reliable. Typically it has to be fact based so opinions don't count as competent substantial evidence unless they're expert opinions that are fact based through some sort of verifiable method."

68. Although the Commission did not receive any expert opinions throughout the various hearings to support denying the application, and although it did not receive any competent substantial evidence (or any evidence at all) that the DRC misapplied or failed to apply the ULDR in approving the application, it denied Edgewater's application by a vote of 3 to 2.

### *Indistinguishable Permit Applications Approved*

69. Around the same time the Commission arbitrarily denied Edgewater's site plan application without making any finding that the proposed residential Alexan development failed to comply with the URDL as the City's own code requires, the Commission allowed staff approval to stand on at least four indistinguishable residential developments in the same Activity Center where the proposed Alexan would have stood.

    a. On February 20, 2018, the City Commission considered a proposed development at 419 SE 2nd Street which had been approved by City Staff. This mixed-use multi-family project will contain 374 residential units and 2,914 square feet of retail and restaurant space. The proposed structure will include 32 stories, making it 333 feet, 10 inches tall. The Commission discussed whether City Staff misapplied or failed to apply some provision of the ULDR in approving this project, but the Commission did not call up the project for de novo review.

    b. On August 28, 2018, The City Commission considered a proposed development at 201 South Federal Highway, which had been approved by City Staff. This mixed-use,

multi-family residential project will contain 352 residential units and 3,200 square feet of restaurant and retail space. The City Commission did not call up the project for de novo review.

   c.  On September 25, 2018, the City Commission considered a proposed development at 501 South Andrews Avenue, which had been approved by City Staff. This mixed-use, multi-family residential project will contain 790 residential units, 297 hotel rooms, 44,698 square feet of restaurant and retail space plus another 296,459 square feet for offices. This project consists of three buildings rising 36, 36, and 43 stories respectively. The Commission discussed whether City Staff had misapplied or failed to apply the ULDR in approving this project, but the Commission did not call up the project for de novo review.

   d.  On April 2, 2019, the City Commission considered a proposed development at 629 SE 5th Avenue, which had been approved by City Staff. This mixed-use, multi-family residential project will contain 246 residential units and 1,300 square feet of restaurant and retail space. The building will be 34 stories tall. The Commission discussed whether City Staff had misapplied or failed to apply the ULDR in approving the development, but the Commission did not call the project up for de novo review.

70. After Edgewater filed a claim against it in state court, the Commission acknowledged its error in failing to give a reason for the denying Edgewater's application but then attempted to produce a report after-the-fact to support that denial. However, that report was never authenticated, it was not prepared by an expert, was never discussed at any commission meeting and its contents do not apply to the Alexan Property because it relies solely on uncodified

19

provisions that are otherwise inapplicable to the Alexan. Through this report or otherwise, the City has not and cannot point to any codified provision Edgewater's application violates.

71. Furthermore, in Mayor Trantalis' May 2019 newsletter, the Mayor makes three momentous concessions regarding the City's disparate treatment towards the Alexan. First, he admits the DMP is not currently codified stating "City staff is currently working to update the downtown master plan to "put into law principles that previously were mere suggestions" and "the commission is scheduled to vote on these reforms in the fall." Second, he admits transition zones do not apply stating the new proposal will "create a transition zone around downtown's borders." Third, he admits that the Commission wrongly called up the Alexan for review without finding any staff error stating, "[u]nder the current land development code, many downtown projects are approved with only a review by city staff. The commission can only intervene if it finds substantial evidence that staff made a grievous error in judgment."

72. As a result of the Commissions actions in singling it out for discriminatory treatment, Edgewater has suffered substantial damages including from costs incurred in drafting multiple alternative site plans and from significant delays in developing the Alexan Tarpon River project.

73. As a result of the Commissions' actions, Edgewater has been deprived of its basic fundamental rights of equal protection and procedural due process under the law.

74. No rational basis exists for the Commission to have called up and ultimately denied Edgewater's application, which complied with each and every ULDR requirement, while at the same time rubber stamping at least four other indistinguishable applications without calling those projects up for review.

75. Edgewater thus asks this court to declare that the Commission's Resolution denying the application is unconstitutional under section 42 U.S.C. § 1983, and to issue an injunction

directing the Commission approve Edgewater's application, to award Edgewater its fees and costs in this litigation, and to award such other relief as this Court deems just and proper.

76. All conditions precedent to the bringing of this action have been waived or met.

## COUNT I

### THE COMMISSION VIOLATED EDGEWATER'S RIGHT TO BE TREATED EQUALLY WITH OTHER APPLICANTS WHO ARE SIMILARLY SITUATED WITHOUT A RATIONAL BASIS TO DO SO

77. Edgewater reasserts paragraphs 1 through 74 as if fully set forth here.

78. This is an action for declaratory relief asking this Court to declare that Edgewater's application to develop the Alexan was automatically approved on April 5, 2018 after the Commission failed to find that City Staff misapplied or failed to apply any ULDR provision. This is also an action for injunctive relief requesting this Court to order the Commission to approve Edgewater's original application. Edgewater also seeks damages under 42 U.S.C. §§ 1983 and 1988 due to the Commission's official action via Resolution No. 18-160, denying Edgewater's site plan application despite its clear conformance with the applicable requirements and thus creating a class of one that violates Edgewater's right to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

79. The Commission through Resolution No. 18-160, took official action that violated Edgewater's equal protection rights here by treating it differently than similarly situated applicants, when no rational basis exists for the difference in treatment.

80. Here, the Commission intentionally discriminated against Edgewater, with no rational basis for doing so, by (1) "calling up" the Alexan project for review without making any finding that the staff misapplied or failed to apply the ULDR; and (2) denying Edgewater's site plan

application while (3) simultaneously declining to call up and thereby approving other site plan applications having no distinguishable difference from Edgewater's plan.

81. The Commission violated Edgewater's right to equal protection under the law because it denied Edgewater's site plan application while approving at least four other applications for residential developments that were (1) as dense or denser than the Alexan; (2) as tall or taller than the Alexan; (3) within the Activity Center, the same zoning district as the Alexan; (4) submitted around the same time as the Alexan; and (5) governed by the identical regulations as the Alexan.

82. The Commission acted arbitrarily and capriciously and in furtherance of no legitimate government interest. The decision to deny Edgewater's permit was instead based on opposition from residents in nearby developments who voiced no legitimate basis to disapprove the Alexan under the current regulations.

83. The Commission knowingly violated its own rules, including but not limited to ignoring the advice of its own general counsel, to purposefully single out Edgewater for unequal treatment to appease the neighbors despite Edgewater's clear right to approval.

84. In approving four indistinguishable developments, the Commission discussed the proper procedure for calling up an application for de novo review, revealing that it knew it was required to make a finding that the DRC misapplied or failed to apply one or more provisions of the ULDR before conducting de novo review. Yet it made a conscious decision not to apply the same rules in the same manner to Edgewater.

WHEREFORE, Edgewater respectfully requests that this Court

1. Declare that the Fort Lauderdale City Commission, acting under the color of law, denied Edgewater equal protection of the law,

2.  Order the Commission to grant Edgewater's original site plan application to develop

    the Alexan;

3.   Grant Edgewater the attorney's fees and costs it has incurred in this action and

    throughout the administrative process below;

4.  Grant such other relief this Court deems right and proper.


/s/ Cindy A. Laquidara
CINDY A. LAQUIDARA (FBN 394246)
cindy.laquidara@akerman.com
kim.crenier@akerman.com
Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, FL  32202-3640
Telephone: (904) 798-3700
Direct:  (904)598-8612
Facsimile: (904) 798-3730

*Attorney for Plaintiff*

48742501;2